[L. A. No. 4163.    Department One.—March 29, 1918.]*

FREDERICK C. HANSON, Respondent, v. ELLEN S. BRININSTOOL et al., Appellants.

[1] PLEADING—COUNTERCLAIM—DEFAULT.—A plaintiff's default entered on the defendants' pleading is of no effect where the matter contained in defendants' pleading is properly treated as a counterclaim, and not as a cross-complaint, the allegations of the counterclaim in such a case being deemed denied.

[2] CONTRACT—PURCHASE OF STOCK IN CORPORATION—OPTION TO REPURCHASE—REVERSION OF STOCK UNPAID FOR—CONSTRUCTION.—Under an agreement by an employee with his employers to purchase stock in a corporation to be organized providing that the stock should be delivered to the employers as security for the payment of the purchase price and be held by them until full payment was made, and further providing that if the employee should leave the service of the corporation, or should die, before the purchase price was fully paid, the employers should have a sixty days' option to purchase such number of shares as might then have been fully paid for "at the inventory price," and "that any and all stock not then fully paid for shall immediately revert to, and become the property of," the employers without cost or expense, the failure of the employers, after the termination of said employee's connection with the corporation, to exercise the option provided for in the agreement did not affect the independent provision that the employee's right to acquire further shares should cease, and that the shares which he had contracted to buy, but had not yet paid for, should revert to the employers; and with such reversion, the obligation to pay the purchase price

---

*Through mistake, this case was not previously reported.

fell and promissory notes given by the employee for such unpaid purchase price ceased to be binding.

[3] ID.—ACTION TO COMPEL DELIVERY OF STOCK AND SURRENDER OF NOTES — AMOUNT OF PAYMENT — FINDINGS — EVIDENCE. — In this action by the employee to compel the delivery of so much stock as had been paid for by him under such agreement and to compel the surrender of promissory notes given by him for the unpaid purchase price of the stock, the evidence was insufficient to support the findings of the trial court with reference to the amount which plaintiff had paid on the agreement at the time he left the employ of the corporation.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Fred H. Taft, Judge. Reversed.

The facts are stated in the opinion of the court.

George W. McDill for Appellants.

Robt. T. Linney and Gordon L. Finley for Respondent.

SLOSS, J.—The plaintiff brought this action to compel the defendants to transfer to him 2,096 shares of the capital stock of the Brininstool Company, a corporation, or to pay him their value, and to surrender two promissory notes executed by plaintiff to defendants. We shall, for the purpose of simplifying the discussion, treat the defendants as jointly interested to the extent of the entire matter in controversy, although the complaint did not seek the same relief against each.

Prior to January, 1912, the defendants had been conducting business as partners. The plaintiff had been in the employ of the firm, receiving a salary and five per cent of the net profits. It was decided to form a corporation to carry on the business, and an understanding was reached for the acquisition by plaintiff of an interest in the new corporation. Subsequently, the plaintiff and the defendants executed a written agreement, dated November 19, 1912, providing for the sale, by defendants to plaintiff, on terms which we shall have occasion to set forth hereinafter, of a number of shares of the capital stock of the Brininstool Company, a corporation to be organized.

This agreement was superseded by a second one, dated January 31, 1913. This second contract, which is annexed to the complaint and is made the basis of the present action, provided that the defendants should sell and the plaintiff buy 4,720 shares of the stock, at the agreed price of $3,750. The plaintiff was to pay to the defendants, by order upon the corporation, all moneys due and owing by the corporation to him on January 31, 1913, as part payment, and the balance was to be paid by all dividends earned and payable on said 4,720 shares, and by the payment of all salary, over and above $150 per month, paid to the plaintiff by the corporation. It was agreed that the 4,720 shares should be delivered to the defendants as security for the payment of the purchase price, and held by them until payment was made in full. But the agreement further provided that if Hanson should leave the service of the corporation, or should die, before the purchase price was fully paid, the defendants should have a sixty days' option to purchase such number of shares as might then have been fully paid for, "at the inventory price ·. . . obtaining at the last fiscal period; and further, that any and all stock not then fully paid for shall immediately revert to, and become the property of, the said second parties (defendants) . . . without cost or expense and this agreement, *ipso facto,* shall then terminate, and there shall be no further claim against the said second parties . . . ; it being understood . . . that part of the consideration for this agreement, during its existence, shall be the continuous and faithful performance of personal service to the corporation hereinbefore mentioned on the part of the said first party (the plaintiff) herein."

The complaint, to which a copy of this agreement was annexed, alleged that at the time the contract was made the plaintiff paid to the defendants on account of the purchase price the sum of $970 in the manner specified in the contract, and that, on February 15, 1913, he paid them in like manner the sum of $1,126. On the last-named date, he executed his promissory notes to the defendants for $2,624, which, it will be observed, was the difference between $3,750, the purchase price specified in the agreement, and $1,126, the amount of the payment made on February 15th. It was further alleged that the plaintiff had left the

employ of the corporation, and that the defendants had not .exercised their option to purchase the stock for which he had paid. He demanded of them the surrender of his notes and the transfer of 2,096 shares of stock, which demand was refused.

It will not be necessary to set forth the denials and averments made by the defendants in their pleading. The court made findings in substantial accord with the contentions of the plaintiff, and entered judgment requiring the defendants to turn over to him 2,175 shares of the stock and the notes.

On motion for a new trial the court made a conditional order, pursuant to which the plaintiff consented to have the number of shares which he was to receive under the judgment reduced to 2,000. Thereupon the motion for a new trial was denied. The defendants appeal from the judgment and from the order denying their motion for a new trial.

The appellants make a number of points, but the important questions are but two.

First: The defendants argue that, under the terms of the agreement, they were entitled to hold all of the stock as security for the purchase price, and the plaintiff was not entitled to any shares until said price was paid in full. By two subdivisions of their pleading, each of which is designated as a further and separate defense, "and by way of a counterclaim and cross-complaint," the defendants assert this position, and seek to recover on the notes given to them by the plaintiff. On this pleading the defendants had plaintiff's default entered. [1] But we think the matter so pleaded was properly treated by the court as a counterclaim, and not as a cross-complaint. In this aspect its allegations were deemed denied, and the default had no effect.

[2] The right of the defendants to hold all of the stock as security turns upon the construction of the written agreement. On behalf of the defendants it is argued that the obligation to pay for all of the stock continued, notwith-standing the termination of plaintiff's connection with the corporation. They interpret the contract to mean that the provision that all stock not paid for should revert to and become the property of the defendants was to be applicable only in the event that defendants exercised their option to

repurchase the shares which had been paid for. If this be the correct view, the plaintiff still remained bound to pay the balance due on the stock, and the defendants had a right to hold all the shares as security for such balance. But we do not so read the agreement. In the event of the termination of plaintiff's relations with the corporation, the contract gives to the defendants the option of acquiring "at inventory price" the shares already paid for by the plaintiff. The further provision that the shares not then paid for shall become the property of the defendants is absolute. It is not made dependent upon the exercise of any option. The whole agreement, and particularly the last clause quoted above, shows that one of the reasons for allowing the plaintiff to acquire the stock was the expectation and belief that he would continue in the service of the corporation. Accordingly, it was provided that if he should leave such service, or should die, he should not be entitled to receive any shares beyond those for which he had made payment, and that the defendants might, if they desired, repurchase even those. Their failure to exercise the option did not affect the independent provision that the plaintiff's right to acquire further shares should cease, and that the shares which he had contracted to buy, but had not yet paid for, should revert to the defendants. With such reversion, the obligation to pay the purchase price, of course, fell and the notes given for such unpaid purchase price ceased to be binding.

Second: **[3]** The other disputed question turns on the sufficiency of the evidence to support the findings with reference to the amount which plaintiff had paid on the contract at the time he left the employ of the corporation. The plaintiff's theory, embodied in his complaint, was that the contract was for the purchase of 4,720 shares at the agreed price of one dollar per share; that $970, due him at the time the contract was made, was then credited as a part payment, leaving a balance of $3,750 to be paid. It was conceded that $1,126 was paid thereafter. The defendants' claim, on the other hand, was that the contract was one for the sale of 4,720 shares at a total price of $3,750 (or about 80 cents per share), and that there was not any payment of $970, as alleged by the plaintiff and found by the court. The claim of the appellants seems to be in

precise accord with the terms of the writing, which declares expressly that Hanson agrees to buy and the Brininstools agree to sell 4,720 shares at the agreed price of $3,750. Both the agreement of January 31, 1913, and the agreement of November, 1912, are vague and confused in phraseology. So, too, the evidence on which plaintiff relies is far from clear. Without undertaking to state or to analyze in detail the elaborate terms of the two contracts, we may summarize our understanding of the situation disclosed by the record, as follows: The plan of incorporating the business and giving Hanson an interest in it was first broached in 1911. No written contract was made at that time, but the understanding apparently was that a company should be formed at the beginning of 1912 with such number of shares, of the par value of one dollar each, as would represent the actual value of the net assets. Hanson was to purchase five per cent of such shares. For some reason the consummation of the plan was delayed. The first written agreement was made in November, 1912, and the corporation was not formed until January, 1913. The first writing provided for the sale to Hanson of 3,750 shares, "more or less," and was based upon an estimated value of the corporate assets of $75,000, as of January 1, 1912. Five per cent of this would be $3,750, and this represented the amount of the capital stock which Hanson was to receive. The corporation not having yet been formed, however, provision was made in the contract of November, 1912, for protecting Hanson's five per cent interest in the profits of the partnership during the year elapsing before the incorporation. It was, therefore, provided that he was to receive, for the $3,750, such additional number of shares as would be represented by five per cent of the net profits of the corporation during the year 1912. These profits were not divided, but were turned over to the corporation when formed, as a part of its capital. Its net capital at the time of its organization in January, 1913, amounted to some $98,000. The corporation was formed with a capital stock of 100,000 shares, of the par value of one dollar each. The second agreement gave to Hanson the right to purchase 4,720 shares, which, assuming the stock to be worth par, represented, approximately, a five per cent interest in the corporation, as it stood on January 1, 1913.

This interest he was still to purchase for $3,750, so that the second agreement followed out, substantially, the plan of the first, the only difference being that while the first prescribed the method for determining the additional number of shares which should come to him by reason of the profits of the year 1912, the second agreement was made after these profits had been ascertained, and it had thus become possible to determine and specify the number of shares. The first agreement states that the stock is to be bought at one dollar per share. The second does not contain this provision. But, in fact, neither agreement, when all its terms are considered, contemplates a purchase at that price. Each provides for a purchase of such number of shares as shall represent a five per cent interest in the property of the corporation on January 1, 1913, for the sum of $3,750. In so far, then, as any profits were turned over to the corporation as a part of its capital, and remained undivided among the stockholders, Hanson obtained his interest in them by being permitted to purchase an additional number of shares in the corporation without further payment of money. Under the second agreement, payment for the stock was to be made to the defendants out of dividends payable on the 4,720 shares, and from the salary of Hanson, by orders on the corporation. It is not claimed that the $970 in dispute was ever paid to defendants. It remained in the corporation as a part of its assets. We are unable to see, therefore, how a finding that anything had been paid on the stock, except the $1,126 above referred to, can be upheld. This being so, there is no sufficient foundation for the original judgment awarding to plaintiff 2,175 shares, nor yet for the modified judgment for 2,000 shares. It also follows from the foregoing discussion that finding 4, to the effect that plaintiff purchased these shares of the defendants at the agreed price of one dollar per share, cannot stand.

The other points made by the appellants are of minor importance and do not affect the substantial merits of the controversy.

The judgment and the order denying a new trial are reversed.

Richards, J., *pro tem.*, and Shaw, J., concurred.